UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TONY BURTON,

                              Plaintiff,

                                                      **OPINION**
                                                      No. 08 Civ. 8791 (LBS)

                    v.

J. LYNCH, Correctional Officer; G. KENNEDY,
Correctional Officer; GIROD CORDELL, Nurse;
JANE DOE #505, Nurse; JANE DOE #423,
Nurse; CHRISTEN, Nurse; DR. SUPPLE,
Facility Doctor; and WILLIAM J. CONNOLY,
Superintendent of Fishkill,

                              Defendants.

SAND, J.:

        Plaintiff Tony Burton, committed to the custody of the New York State

Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C.

§ 1983, alleging that Defendants, each of whom is or was at the relevant time a DOCS

employee, violated his federal constitutional rights.  Before this Court is Defendants

Girod Cordell, Superintendent William J. Connoly, and Dr. John Supple's

("Defendants") motion to dismiss Plaintiff's claims for failure to state a claim.[1]  For the

foregoing reasons, Defendants' motion is granted as to Defendants Girod Cordell and

Superintendent William J. Connolly, and denied in part as to Defendant Dr. John Supple.

---

[1] Defendants Christen, Jane Doe #505, and Jane Doe #423 have not been served, and thus do not join in this motion.  Defendants J. Lynch and G. Kennedy also do not join in this motion, as the Court granted them an extension of time to answer, move, or otherwise respond to Plaintiff's complaint until 30 days after the Courts' ruling on the instant motion.

## I.      Background[2]

Plaintiff alleges that, while incarcerated at Fishkill Correctional Facility ("Fishkill"), on January 13, 2006 at approximately 6:45 am, he was praying before eating his breakfast in the Fishkill mess hall.  (Compl. ¶ 7.)  While praying, he failed to hear Officer Harcher order all inmates in the mess hall to move to their correct seats, and he then changed seats when he heard the Officer ask him a second time after his prayer.  (Compl. ¶ 7.)  After his meal, Correctional Officer Lynch ordered him to turn around, and then to accompany him to an unsupervised office in the back of the mess hall.  (Compl. ¶ 7.)

Once in the office, Officer Lynch accused him of having heard Officer Harcher's first order to change seats, but Plaintiff protested that he had not.  (Compl. ¶ 7.)  Officer Lynch told Plaintiff that he would be sent to the Special Housing Unit ("SHU"), and then ordered Plaintiff to place his hands on the wall and began kicking Plaintiff's legs and ankles.  (Compl. ¶ 7.)  Officer Lynch "pulled the pin from his radio/walkie talkie" and was joined in the office by Officer Kennedy and three other unknown officers.  (Compl. ¶ 7.)  The officers began punching his face, body, back, and arms, and Plaintiff was then handcuffed behind his back.  (Compl. ¶ 7.)  Officer Kenendy then slammed the left side of his face into the wall and proceeded to put him in a "full choke hold," which caused him to not be able to breathe.  (Compl. ¶ 7.)  Officer Kennedy then released him from the choke hold when another officer told him to stop because Plaintiff was passing out from lack of air.  (Compl. ¶ 7.)  Plaintiff was then "dragged" to SHU, where a Correctional Sergeant took photos of his injuries, and all of his

---

[2] The facts stated in this section are as alleged by Plaintiff in the Complaint.

requests for medical assistance were "denied and or not documented to ensure that there was no record . . . [and] to cover-up" the assault by the officers.  (Compl. ¶ 7.)

Plaintiff then made numerous requests to see a doctor and/or informed Fishkill employees of his continued denial of medical care over the next several weeks, to no avail.[3]  (Compl. ¶¶ 8-24.)  On February 9, 2006, Plaintiff was seen by a nurse "for the first time" due to the fact he claimed he had a rash.  (Compl. ¶ 24.)  He was given hydrocortisone cream, but the nurse refused to examine his injuries from the beating because he had not requested attention for those injuries in writing.  (Compl. ¶ 24.)  On February 10 and 14, 2006, Plaintiff saw another nurse[4] who told him she had made a doctor's appointment for him.  (Compl. ¶ 25.)  On February 12, 2006, he spoke to his mother, who informed him that "someone from the Albany Inspector General's Office" told her that Plaintiff had been seen by a doctor twice since being placed in SHU. (Compl. ¶ 26.)

On February 14, 2006 at approximately 10 am, Plaintiff alleges he was taken to see Dr. Supple.  (Compl. ¶ 29.)  Plaintiff told Dr. Supple that his right ankle was swollen, and showed Dr. Supple the difference between his two ankles.  (Compl. ¶ 29.) He then told Dr. Supple of the beating and denial of medical care.  (Compl. ¶ 29.)  Dr.

---

[3] Plaintiff alleges that over the period from January 13, 2006 to February 8, 2006, he made requests to see a doctor and/or relayed his continued denial of medical care to the following people on the following days: Father Dormido on January 13 (Compl. ¶ 8); "Mr. Riconda of Mental Health" on January 13 (Compl. ¶ 9); Sergeant M. Bizzell on January 14 and 19 (Compl. ¶ 10-11); Captain Schaller, Father Dormido and Mr. Riconda on January 20 (Compl. ¶ 12); "Dr. Karri of Mental Health department" on January 24 (Compl. ¶ 13); Nurse Christen on January 25 (Compl. ¶ 14); Father Dormido on January 27 (Compl. ¶ 15); Mr. Riconda on January 27 (Compl. ¶ 15); Captain Schaller on January 30 and 31 (Compl. ¶ 16-17); Mr. Riconda, Father Frank, and "Mr. Smith of mental health" on February 1 (Compl. ¶ 18); Plaintiff's mother Mrs. Joyce Prince on February 5 (Compl. ¶ 21); and Mr. Riconda on February 7 and 8. (Compl. ¶ 22.)

[4] Plaintiff alleges that the nurse he saw on February 10 and 14, 2006 was the "same nurse who did my assessment from the beating of 1/13/2006 and deliberately failed to document all the injuries."  (Compl. ¶ 25.)  Yet, Plaintiff alleges earlier in the Complaint that on January 13, 2006, immediately after the alleged beating, "[a]ll request for medical was denied and or not documented to ensure that there was no record of injuries . . . ."  (Compl. ¶ 7.)

Supple replied that Plaintiff had "sprung" his ankle, and asked what else was bothering him.  (Compl. ¶ 29.)  Plaintiff told Dr. Supple that he could not straighten his left arm without receiving a lot of pain from his elbow, and Dr. Supple responded that there was nothing wrong with it "without touching it or ex-rays."  (Compl. ¶ 29.)  Plaintiff then asked Dr. Supple to take x-rays of his ankle and elbow, but Dr. Supple agreed only to take an x-ray of his ankle.  (Compl. ¶ 29.)  After the x-ray was taken, Plaintiff asked Dr. Supple if he was going to examine his "right lower back."  (Compl. ¶ 29.)  Dr. Supple refused and gave Plaintiff a "hand full of Motrins" for his pain.  (Compl. ¶ 29.)  Plaintiff protested that he was allergic to Motrin, and Dr. Supple replied, "that's your problem," and left.  (Compl. ¶ 29.)  Plaintiff alleges that Dr. Supple deliberately and maliciously prescribed him Motrin in retaliation for a previous grievance Plaintiff had filed against Dr. Supple.  (Compl. at 10).  On February 15, 2006, Plaintiff lodged a complaint about Dr. Supple's care with Mr. Smith from mental health care, who said he would call Dr. Supple's supervisor.  (Compl. ¶ 30.)  This complaint led to Correctional Officer Kitson retrieving all the Motrins from Plaintiff's cell an hour later, after Plaintiff's medical records had been consulted.  (Compl. ¶ 30.)

Plaintiff filed two grievances related to the alleged facts outlined above with the Fishkill Inmate Grievance Program.[5]  (Compl. ¶¶ 31-38; Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A.)  On February 12, 2006, Plaintiff filed a grievance, number 27560-06, relating to the alleged beating of January 13, 2006.[6]  (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A at 1.)  On February 16, 2006, Plaintiff filed a second grievance, number

---

[5] The account of the grievances is based both on Plaintiff's allegations in the Complaint and copies of numerous grievance documents attached as exhibits to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss.

[6] This grievance was marked as received by the Inmate Grievance Program on February 14, 2006.  (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A at 1.)

27585-06, pertaining to his visit with Dr. Supple and the dispensation of Motrin.[7]  (Pl's. Mem. Opp'n Def's. Mot. Dismiss. Ex. A at 7.)

The Inmate Grievance Resolution Committee heard the grievance relating to the alleged beating, and Plaintiff appealed to Superintendent William J. Connolly, who rendered a decision on March 1, 2006.  (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A at 3.)  Plaintiff then appealed to the Central Office Review Committee ("CORC"), which rendered a decision on March 29, 2006 finding that there was "no evidence to substantiate any malfeasance" after investigating the matter.  (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A at 4; Compl. ¶¶ 35-36.)

On February 28, 2006, the Inmate Grievance Resolution Committee heard Plaintiff's second grievance, relating to Plaintiff's visit with Dr. Supple.  Plaintiff appealed to the Superintendent, who denied the grievance but noted that that "Dr. Supple . . . stated that he did not notice the front cover sticker" on Plaintiff's medical records indicating his Motrin allergy.  (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A at 12.)  Plaintiff then appealed to CORC, which rendered a decision on March 31, 2006.  CORC found that there was "no evidence of malice by the physician," but noted that the "physician has acknowledged the error [in prescribing Motrin] and notes that [Plaintiff] failed to bring such an allergy to the physician['s] attention at that time."  (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A at 14.)

Plaintiff was "transferred to Southport Correctional Facility [("Southport")] shortly after the incident[s]" described in the Complaint.  (Compl. ¶ 1.)  While Plaintiff has not provided the exact date of his transfer, by February 28, 2006, the Fishkill

---

[7] This grievance was marked as received by the Inmate Grievance Program on February 21, 2006.  (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A at 7.)

Inmate Grievance Program Supervisor noted that Plaintiff resided at Southport.  (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A 11.)  On August 8, 2006, Plaintiff underwent surgery on his left arm at Wyoming County Community Hospital, receiving a procedure referred to in his medical records as a left "ulnar nerve release" to treat "a mild to moderate (L) carpal tunnel syndrome and a slight cubital tunnel syndrome (L) arm." (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. B 1, 6.)  At the time of filing the Complaint and opposing the instant motion, Plaintiff resided at Great Meadow Correctional Facility.

Plaintiff brought a Complaint against Defendants on September 17, 2008.[8] Plaintiff alleges that Defendants violated his Eighth Amendment right to be free of cruel and unusual punishment.  He alleges that Defendants Girod Cordell and Dr. Supple "failed to provide adequate medical care . . . [and denied] access to pain medication or relief from pain for over 30 days," constituting deliberate indifference to serious medical needs in violation of the Eighth Amendment.  (Compl. at 10.)  He also alleges that Dr. Supple retaliated against him for filing a previous grievance in violation of the First Amendment.  (Compl. at 10.)  He alleges that Defendant Connolly "filed false responses to cover up the deliberate unprofessional conduct of his staff, refused to correct and or to stop the continued denial of access to medical care, breaching his duty to protect all inmates within his care, and allow[ed] Vigilante Gang Assaults to continue without any proper investigation" in violation of the Eighth Amendment. (Compl. at 10-11.)

---

[8] Though Plaintiff's Complaint is marked "non-jury trial demanded," the Court notes that Plaintiff's demand cannot preclude Defendants from seeking a jury trial.  U.S. CONST. amend. VII.

Plaintiff seeks one hundred million dollars in damages from each Defendant. (Compl. at 10-11.)  Plaintiff also seeks an additional one hundred thousand dollars in punitive damages from Defendant Girod Cordell, and one million dollars in punitive damages from both Defendant Dr. Supple and Defendant Connolly.  (Compl. at 10-11.) Lastly, Plaintiff seeks two injunctions: (1) "ordering Fishkill Correctional Facility and all agents thereof not to bring inmates into unauthorized areas for alleged pat frisk and or to beat them, and if [there] is a question [as] to the conduct of any inmate, [to] use the disciplinary procedure and not take the law into [their] own hands," and (2) ordering that "all defendants be fired from the New York State Department of Correctional Services and never be allowed to hold any civil servant job within New York State." (Compl. at 10.)

## II.    Discussion

On a motion to dismiss, a court reviewing a complaint will consider all material factual allegations as true and draw all reasonable inferences in favor of the plaintiff.  *Lee v. Bankers Trust Co.*, 166 F.3d 540, 543 (2d Cir. 1999).  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level."  *ATSI Commc'ns Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 93 (2d Cir. 2007) (internal quotation omitted). Ultimately, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).  "[A] simple declaration that defendant's conduct violated the ultimate legal standard at issue . . . does not suffice."  *Gregory v. Daly*, 243 F.3d 687, 692 (2d Cir. 2001).

When reviewing a *pro se* complaint for failure to state a claim, a court is obligated to employ less rigorous standards than if the complaint was drafted by counsel.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) ("A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.")  (internal quotations and citations omitted).  But nonetheless, a *pro se* plaintiff must still "identif[y] the particular events giving rise to her claim" so as to give defendants "fair notice of her claim and the grounds upon which it rests."  *Boykin v. KeyCorp.*, 521 F.3d 202, 214-15 (2d Cir. 2008) (citation omitted).

In reviewing a complaint, a court is not limited to the four corners of the complaint; a court may also consider "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."  *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).  This includes the "full text of documents partially quoted in [the] complaint."  *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (citing *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-09 (2d Cir. 1996)).[9]

---

[9] As such, the Court also relies on the medical record and grievance documents attached as exhibits to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss in deciding the instant motion.  Many of the grievance documents are "partially quoted in [the] complaint."  *Faulkner*, 463 F.3d at 134; (*see also* Compl. ¶¶ 33, 34, 36 (quoting the Superintendent's and CORC's disposition of grievance 27585-06 and CORC's disposition of grievance 27560-06).)  The remaining grievance documents and the medical records were either "in plaintiffs' possession or [documents] of which plaintiffs had knowledge and relied on in bringing suit."  *Brass*, 987 F.2d at 150.

### A.  Injunctive Relief

Plaintiff seeks two injunctions against Fishkill and its employees.[10]  "It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility."  *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996); *see also Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."); *Verley v. Wright*, No. 02 Civ. 1182 (PKC), 2007 WL 2822199, at *9 (S.D.N.Y. Sept. 27, 2007) ("To the extent that plaintiff seeks injunctive and declaratory relief directed at officials at [the transferring facility], those claims are now moot as plaintiff is no longer incarcerated [there].").

While Plaintiff was incarcerated at Fishkill during the time of the events alleged in the Complaint, Plaintiff states that he was "transferred to Southport Correctional Facility shortly" thereafter.  (Compl. ¶ 1.)  At the time of filing the Complaint and opposing the instant motion, Plaintiff resided at Great Meadow Correctional Facility. Accordingly, Plaintiff's request for an injunction binding on Fishkill is moot by reason of his transfer to another correctional facility.

For the same reason, Plaintiff's second request for injunctive relief against Fishkill's employees is moot.  Plaintiff alleges only that Defendants either were employed at Fishkill at the time of the events described in the Complaint, or are currently employed at Fishkill, and has not alleged that any Defendant is currently

---

[10] Plaintiff seeks (1) an injunction "ordering Fishkill Correctional Facility and all agents thereof not to bring inmates into unauthorized areas for alleged pat frisk and or to beat them, and if [there] is a question [as] to the conduct of any inmate, [to] use the disciplinary procedure and not take the law into [their] own hands," and (2) an injunction ordering that "all defendants be fired from the New York State Department of Correctional Services and never be allowed to hold any civil servant job within New York State."  (Compl. at 10.)

employed or will be employed at his present facility.  Because this claim is moot, the
Court need not go on to consider whether the variety of injunctive relief requested by
Plaintiff against Fishkill employees can appropriately be granted by this Court.

### B.  Defendant Girod Cordell[11]

To survive a motion to dismiss, a *pro se* plaintiff must "identif[y] the particular
events giving rise to her claim" so as to give defendants "fair notice of her claim and the
grounds upon which it rests."  *Boykin v. KeyCorp.*, 521 F.3d 202, 214-15 (2d Cir. 2008)
(citation omitted).   Plaintiff's Complaint alleges only that Defendant Cordell was a nurse
"employed by Fishkill Correctional Facility . . . at the time of these events," (Compl. ¶ 3,)
and that Defendant Cordell "failed to provide adequate medical care for [Plaintiff's]
serious medical needs . . . ."  (Compl. at 10.)  Between Plaintiff's opening assertion that
Defendant Cordell was a nurse employed by Fishkill and Plaintiff's closing assertion that
Defendant Cordell failed to provide adequate medical care, Plaintiff's complaint makes
no mention whatsoever of Defendant Cordell.

Plaintiff has thus failed to meet even the more lenient standard for *pro se*
complaints. *Boykin* , 521 F.3d at 214-15.  As Plaintiff has alleged no facts whatsoever to
link Defendant Girod Cordell to any alleged denial of medical care, Plaintiff's bare
assertion of liability will not suffice to state a valid claim for relief.  *See Bell Atl. Corp. v.
Twombly,* 550 U.S. 544, 547 (2007).  Accordingly, Plaintiff's claims against Defendant
Cordell are dismissed.

---

[11] Defendants claim that Plaintiff has failed to exhaust his administrative remedies as to Defendant Cordell
and the other un-served nurse defendants, as is required by the Prison Litigation Reform Act, 42 U.S.C. §
1997(e).  The Court does not at this juncture consider the issue of exhaustion, as it is generally dealt with
on a motion for summary judgment.  *See McCoy v. Goord*, 255 F. Supp. 2d 233, 249-50 (S.D.N.Y. 2003).

### C.  Official Capacity Claims for Monetary Damages Against Defendants Connolly and Dr. Supple[12]

The Eleventh Amendment "forecloses . . . an award of money required to be paid from state funds that compensates a claimant for the state's past violation of federal law." *New York City Health & Hosps. Corp. v. Perales*, 50 F.3d 129, 135 (2d Cir. 1995) (*citing Edelman v. Jordan*, 415 U.S. 651, 668 (1974)).  Insofar as Plaintiff seeks monetary damages from Defendants Connolly and Dr. Supple in their official capacities for past alleged violations of his Eighth Amendment rights, Plaintiff's claims are barred by the Eleventh Amendment.  *See, e.g.*, *Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) ("A claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment.") (*citing Kentucky v. Graham,* 473 U.S. 159, 169 (1985)).

Plaintiff argues that his monetary claims against Defendants in their official capacity seek "prospective relief" because Plaintiff "suffered emotional injuries, mental anguish, and severe abuse[,] . . . and such damages are of a continuing nature."  (Pl's. Mem. Opp'n Def's. Mot. Dismiss 9-10.)  However, all factual allegations in Plaintiff's Complaint relate solely to his past tenure as an inmate at Fishkill.  Regardless of the alleged "continuing nature" of Plaintiff's alleged harms, Plaintiff still seeks damages that are "measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials." *Edelman v. Jordan*, 415 U.S. 651, 668 (1974); *see also Perales*, 50 F.3d at 135 (a suit to "extract money for an accrued liability, as

---

[12] In opposing this motion, Plaintiff clarifies that he is proceeding against all defendants in both their official and individual capacities, to which Defendants do not object. (Pl's. Mem. Opp'n Def's. Mot. Dismiss 8; Def's. Reply Mem. Supp. Def's. Mot. Dismiss 3); *cf. Shabazz v. Coughlin*, 852 F.2d 697, 700 (2d Cir. 1988) (deeming a claim as against defendants in their individual capacity based on the arguments raised by the parties in the face of "ambiguous language" in the complaint).

distinct from a suit seeking the expenditure of state funds for future compliance with a grant of prospective relief," seeks prohibited retrospective relief).  The official capacity claims against Defendants Connolly and Dr. Supple are therefore barred by the Eleventh Amendment, and are accordingly dismissed.

### D.  Individual Capacity Claims for Monetary Damages Against Defendant Connolly

Plaintiff claims that Defendant Connolly is liable for his failure to prevent or remedy (1) the alleged assault of January 13, 2006 and (2) the alleged subsequent denial of adequate medical care, either through his supervisory capacity as Superintendent of Fishkill, or through his denial of the appeals of Plaintiff's two grievances.[13] (Compl. at 10-11; Compl. ¶ 33.)

To plead a claim under section 1983, a plaintiff must allege facts showing that each defendant was personally involved in the alleged violation of constitutional rights "through the official's own individual actions."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009).  "[T]he doctrine of respondeat superior . . . does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity."  *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir. 2003); *see also Hemmings v. Gorczyk,* 134 F.3d 104, 109 n.4 (2d Cir. 1998).  Additionally, "[t]he bare fact that [a defendant]

---

[13] Plaintiff alleges that Fishkill Superintendent William J. Connolly "filed false responses to cover up the deliberate unprofessional conduct of his staff, refused to correct and or to stop the continued denial of access to medical care, breaching his duty to protect all inmates within his care, and allow[ed] Vigilante Gang Assaults to continue without any proper investigation" in violation of the Eighth Amendment. (Compl. at 10-11.).  He further alleges that "all levels of Administration of Fishkill Correctional facility had knowledge of the continued pain suffered by the Plaintiff and continued request[s] for medical care and disregarded these request[s] . . . ." (Compl. at 9.)  However, Plaintiff does not allege that he had any personal interaction or communication with Superintendent Connolly or that he sent Defendant Connolly letters; rather, Plaintiff alleges only that Defendant Connolly ruled on the appeals of plaintiff's two grievances. (Compl. ¶¶ 33, 35.)

occupies a high position in the New York prison hierarchy is insufficient to sustain [a] claim." *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir. 1995).

In order to plead the personal involvement of a supervisor, a plaintiff must show that he "(1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated." *Colon*, 58 F.3d at 873.  At issue here is the second *Colon* factor, whether Defendant Connolly's denial of the appeals of Plaintiff's two grievances suffices for personal involvement.[14]

While the Second Circuit has noted that it is "questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of," *McKenna v. Wright*, 386 F.3d 432 (2d Cir. 2004), courts in this Circuit are divided regarding whether review and denial of a grievance constitutes personal involvement in the underlying alleged unconstitutional act.  *See Garcia v. Watts*, No. 08 Civ. 7778 (JSR), 2009 WL 2777085, at *15-16 (S.D.N.Y. Sept. 1, 2009) (adopting recommendations of Pitman, M.J.) (discussing division and collecting cases). Some courts have distinguished between simply affirming the denial of a grievance and "review[ing] and respond[ing] to a prisoner's complaint" by undertaking some kind of investigation, finding personal involvement only in the latter case.  *Warren v. Goord,*

---

[14] In his memorandum in opposition to the instant motion, Plaintiff contends that Defendant Connolly was personally involved based on the negligent supervision, failing to act on information of rights violations, and creation of a policy or custom *Colon* factors.  However, aside from conclusory allegations, Plaintiff alleges no facts in his Complaint to substantiate any personal involvement of Defendant Connolly based on these factors.  As such, Plaintiff has failed to meet the pleading standard required even of *Pro Se* plaintiffs. *Boykin*, 521 F.3d at 214-15.  Only the second *Colon* factor, relating to Defendant Connolly's denial of the appeals of Plaintiff's two grievances, will be discussed.  *Colon*, 58 F.3d at 873.

476 F. Supp. 2d 407, 413 (S.D.N.Y. 2007); *see also Pugh v. Goord,* 571 F. Supp. 2d 477, 515 (S.D.N.Y. 2008).  Others have drawn a distinction between a pro forma denial of a grievance and a "detailed and specific" response to a grievance's allegations. *Brooks v. Chappius,* 450 F. Supp. 2d 220, 226 (W.D.N.Y. 2006) (citations omitted).

    In the instant case, this Court finds most persuasive the many courts in this Circuit which have held that an alleged constitutional violation complained of in a grievance must be "ongoing" in order to find personal involvement, such that the "supervisory official who reviews the grievance can remedy [it] directly."  *Vega v. Artus,* 610 F. Supp. 2d 185, 198 (N.D.N.Y. 2009) (*citing Hall v. Leclaire,* 06 Civ. 0946(GBD) (JCF), 2007 WL 1470532 at *10 (S.D.N.Y. May 22, 2007), *accepted in part and rejected in part on other grounds,* 06 CV 0946(GBD), 2007 WL 2815624 (S.D.N.Y. Sept. 24, 2007)).  There are several rationales supporting such a rule.

    First, the Supreme Court has repeatedly emphasized that *respondeat superior* liability is not available in a section 1983 action.[15]  Requiring an ongoing constitutional violation which is "capable of mitigation at the time the supervisory official was apprised thereof," *Young v. Kihl*, 720 F. Supp. 22, 23 (W.D.N.Y. 1989), ensures that a Superintendent is not held liable for every constitutional tort committed by a subordinate solely by virtue of his role as the intermediate appellate level in the inmate grievance process.[16]

------

[15] *See, e.g.*, *Iqbal*, 129 S. Ct. at 1948 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*") (*citing Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691(1978)); *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir. 1989).

[16] "Were it otherwise, virtually every prison inmate who sues for constitutional torts by prison guards could name the Superintendent as a defendant since the plaintiff must [exhaust his administrative] prison remedies [under the Prison Litigation Reform Act, 42 U.S.C. 1997,]  and invariably the plaintiff's grievance will have been passed upon by the Superintendent [during the inmate grievance appeal process]." *Thompson v. New York*, No. 99 Civ. 9875 (GBD) (MHD), 2001 WL 636432, at *7 (S.D.N.Y. Mar. 15,

Second, "to avoid holding a supervisor liable solely for a subordinate's violations [in a § 1983 action] a court must apply 'rigorous standards of culpability and causation.'" *Jeffes v. Barnes,* 208 F.3d 49, 61 (2d Cir. 2000) (*quoting Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 405 (1997)).[17]  "Receiving post hoc notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate," because the violation is not "ongoing and the defendant has [no] opportunity to stop the violation after being informed of it."[18]  *Rahman v. Fisher*, 607, F. Supp. 2d 580, 585 (S.D.N.Y. 2009).

Third, the language in the Second Circuit's *Colon* opinion and prior cases dictates that a Superintendent who "failed to *remedy* the violation after being informed of it by report or appeal" will be deemed personally liable.[19]  *Colon*, 58 F.3d at 873

---

2001); *Young*, 720 F.Supp. at 21 (without the caveat that the constitutional violation must be ongoing at time of supervisory review, the "personal involvement doctrine may effectively and improperly be transformed into one of *respondeat superior.*"); *see also* N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(c) (2009) (providing for appeals of Inmate Grievance Resolution Committee decisions to the Superintendent).

[17] To find a defendant liable in a § 1983 action, the defendant must be the proximate cause of the constitutional violation alleged. *Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007) ("[A Section 1983 action] employs the tort principle of proximate causation.") (*citing Townes v. City of New York,* 176 F.3d 138, 146 (2d Cir.1999)).  This entails that a plaintiff must allege facts which, if taken as true, would "demonstrate that the causal connection between the defendant's action and the plaintiff's injury is sufficiently direct." *Gierlinger v. Gleason,* 160 F.3d 858, 872 (2d Cir. 1998).

[18] Requiring an ongoing constitutional violation to find a Superintendent personally liable thus "has the merit of distinguishing cases where denying a grievance only delays relief for a past violation from those in which the denial effectively perpetuates the constitutional violation."  *Hall v. Leclaire,* 06 Civ. 946 (GBD) (JCF), 2007 WL 1470532, at *10 (S.D.N.Y. May 22, 2007), *accepted in part and rejected in part on other grounds,* 2007 WL 2815624 (S.D.N.Y. Sept. 24, 2007).  This principle entails that when a supervisor *can* act to prevent a constitutional violation, he may be held liable.  For example, "liability may attach when a supervisor fails to act on reports of a staff member's previous assaults on the plaintiff and the plaintiff is assaulted again by that same staff member." *Rahman*, 607 F. Supp. 2d at 585 (*citing Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 255 (2d Cir. 2001)).

[19] "Although the second prong of the test to determine personal involvement of a supervisory official uses the word 'remedy' instead of 'prevent,'" *Dallio v. Hebert*, No. 9:06 Civ. 0118 (GTS) (GHL), 2009 WL 2258964, at *4 (N.D.N.Y. July 28, 2009), several courts in this Circuit have reasoned that "[t]he Second Circuit's reference to the failure by a supervisor to remedy a known wrong . . . appears to address cases involving continuing unconstitutional prison conditions that the warden may be proven or assumed to know about, and a refusal by the warden to correct those conditions." *Thompson v. New York,* No. 99 Civ. 9875 (GBD) (MHD), 2001 WL 636432, at *7 (S.D.N.Y. Mar. 15, 2001).

(emphasis added).  A superintendent cannot "remedy" a violation of constitutional rights which has already ceased by ordering some change in prison conditions.[20]

As such, the Court must look to the nature of Plaintiff's two grievances to determine whether they complained of "ongoing" violations which Defendant Connolly could "remedy" in order to determine whether Defendant Connolly was personally involved in the alleged violation of Plaintiff's constitutional rights. *Harnett*, 538 F. Supp. 2d at 524.  Plaintiff's first grievance relates only to the alleged beating of January 13, 2006, and makes no references to any continued threat of injury.  (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A 1-2.)  The only relief requested by Plaintiff was "to have [an] investigation concerning theses officer[s] beating me; and to be seen by a doctor."  (Pl's. Mem. Opp'n Def's. Mot. Dismiss 9-10.)  The request for an investigation speaks to a past harm which has ceased, whereas the request to see a doctor refers to an "ongoing" situation.[21]  But by the time his grievance was marked as received on February 14, 2006, and well before it would have been reviewed on appeal by Superintendent Connolly, Plaintiff had seen Dr. Supple.  (Pl's. Mem. Opp'n Def's. Mot. Dismiss 9-10; Compl. ¶ 29.)  Furthermore, by the time Defendant Connolly answered Plaintiff's appeal on March 1, 2006, Plaintiff had been transferred to Southport. (Pl's. Mem. Opp'n Def's.

---

[20] *See Odom v. Calero*, No. 06 Civ. 15527 (LAK) (GWG), 2008 WL 2735868, at *7 (S.D.N.Y. July 10, 2008) ("The reference in case law to an official who 'fails to remedy' a violation logically applies only to ongoing, and therefore correctable, constitutional violations-not to a specific event that is later subject to formal review by designated officials once the constitutional violation has already concluded."); *Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) ("If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation."); *see also Voorhees v. Goord*, No. 05 Civ. 1407 (KMW) (HBP), 2006 WL 1888638, at *2 (S.D.N.Y. Feb. 24, 2006) (quoting CORC's statement that "monetary damages are not an available remedy through the inmate grievance mechanism") (citation omitted).

[21] The Court does not at this juncture consider whether this alleged ongoing situation amounted to a violation of Plaintiff's constitutional rights, but merely notes that it was of an "ongoing" nature for the purposes of personal involvement analysis.

Mot. Dismiss Ex. A 11.)  Therefore, the first grievance presented no ongoing situation that Defendant Connolly could remedy.

Plaintiff's second grievance relates solely to the February 14, 2006 visit to Dr. Supple.  Although the grievance mentions in passing that this appointment was "the first time [Plaintiff had] seen anyone from the medical department concerning [his] injuries" from the alleged beating, it does not allege that he had requested and was denied medical care.  (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A 7-9.)  The only relief Plaintiff requested in this grievance is to have Dr. Supple investigated, and to have his "elbow and lower back" examined.  (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A 7-9.)  For this grievance as well, the request for an investigation of Dr. Supple relates to a past harm which has ceased, and the request for medical attention relates to an "ongoing" situation.  However, by the time the Inmate Grievance Resolution Committee ruled on this grievance (and before the appeal to the Superintendent), Plaintiff had been transferred to Southport.  Once Plaintiff was transferred out of Fishkill, Defendant Connolly no longer had the authority to grant Plaintiff's requests for additional medical attention.[22]  Indeed, CORC's decisions rejecting Plaintiff's appeal of Defendant Connolly's decisions direct Plaintiff to "address his concerns through sick call at his present facility."  (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A at 7-9.)   Thus, Defendant Connolly was also not notified of any alleged "ongoing" violation of constitutional rights that he could "remedy" via Plaintiff's appeal of the second grievance.

---

[22] *See* N.Y. CORRECT. LAW § 18(2)-(3) (McKinney 2009) ("[T]he superintendent of a correctional facility shall have the supervision and management thereof [and] shall direct the work and define the duties of all officers and subordinates of the facility.").

Accordingly, Plaintiff has not alleged facts indicating that Defendant Connolly was personally involved in any alleged violation of his constitutional rights, and his claims against Defendant Connolly are therefore dismissed.[23]

### E.  Individual Capacity Claims for Monetary Damages Against Defendant Dr. Supple

Plaintiff raises two claims against Dr. Supple.  First, Plaintiff claims Dr. Supple was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment based on (a) Dr. Supple's alleged failure to examine him more fully and (b) Dr. Supple's alleged mis-prescription of a pain medication to which Plaintiff was allergic.  Second, Plaintiff claims that Dr. Supple acted in retaliation for a grievance Plaintiff had previously filed against Dr. Supple, in violation of the First Amendment.

### i.  Deliberate Indifference to a Serious Medical Need

Plaintiff claims that Dr. Supple was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment as a result of his February 14, 2006 appointment with Dr. Supple.  "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain."  *Estelle v. Gamble,* 239 U.S. 97, 101 (1976).  To sufficiently plead a claim of deliberate indifference, Plaintiff must allege facts showing both an objective and a subjective element: "(1) that the alleged deprivation of medical care is, objectively, 'sufficiently serious'; and (2) that the official in question had a 'sufficiently culpable state of mind,'" *Sweeper v. Tavera*, No. 08 Civ. 6372 (HB), 2009 WL 2999702, at *5 (S.D.N.Y. Sept. 21, 2009) (*quoting Farmer v. Brennan,* 511 U.S. 825, 834 (1994)), because he "act[ed] or fail[ed] to act

---

[23] It was unclear from Plaintiff's complaint whether he was raising claims against Defendant Connolly other than those relating to his supervisory capacity.  To the extent any other claims were raised, they are dismissed for failure to allege any facts suggesting individual wrongdoing on Defendant Connolly's part.

while actually aware of a substantial risk that serious inmate harm will result."

*Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006)

### 1.   Objective Seriousness of the Underlying Medical Need

To be "sufficiently serious" under the objective prong of the deliberate indifference standard, a deprivation of medical care must present a "condition of urgency, one that may produce death, degeneration, or extreme pain," *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994), or possibly "result in further significant injury or the unnecessary and wanton infliction of pain."  *Smith v. Carpenter,* 316 F.3d 178, 187 (2d Cir. 2000) (internal quotations omitted).  "[O]nly those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (citation and internal quotations omitted). Though "[t]here is no settled, precise metric [to determine the objective seriousness] of a prisoner's medical condition," *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir. 2003), the Second Circuit has endorsed the following "nonexhaustive" list of factors to assist in analyzing an alleged deprivation: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) whether the plaintiff suffers from 'the existence of chronic and substantial pain.'" *Id.* (citations omitted).  Additionally, "the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* at 187; *Smith v. Carpenter*, 316 F.3d 178, 188 (2d. Cir. 2003).

Plaintiff alleges that Dr. Supple refused to examine his elbow, saying only that was "there was nothing wrong with it without touching it or x-rays." (Compl. ¶29.) When the alleged violation is a failure to provide medical treatment, "courts examine whether the inmate's [underlying] medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280.  Plaintiff's allegations regarding his injuries are not particularly detailed,[24] but by the time he saw Dr. Supple, he "could not straighten [his] left arm without receiving a lot of pain from [his] elbow." (Compl. ¶29.)  Plaintiff's medical records also note that Plaintiff complained of "numbness in the 4th and 5th fingers (L) hand" at the time of his surgery, almost six months after the appointment with Dr. Supple.[25]  (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. B 1).

Taking these allegations as true, and construing his *pro se* complaint liberally in deciding a motion to dismiss, *Erickson v. Pardus,* 551 U.S. 89, 94 (2007), it appears that a "reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment.'"  *Brock*, 315 F.3d at 162.  The fact that surgery was later required is an "actual medical consequence[] that flow[ed] from the alleged denial of care" and is thus "highly relevant" to the inquiry into the objective seriousness of Plaintiff's injuries.  *Id.* at 187.  Plaintiff has also plausibly alleged that his injuries "significantly affect[ed his] daily activities" for lack of ability to straighten his elbow and fully utilize his left arm.  *Id.*  Thus, having satisfied two of the three *Brock*

---

[24] Plaintiff alleges that in the period immediately after the beating he was "hurt" and had "injuries of back, ankle, and elbow areas."  (Compl. ¶ 18.)  In his grievance relating to the alleged beating, he claims that the beating left him with "a left black eye, a swollen right ankle, a swollen left arm, and my right side lower back was hurting real bad; I couldn't' even stand on my ankle that's how bad it was."  (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A 1.)  Plaintiff does not specify the extent to which these injuries remained at the time of his appointment with Dr. Supple.

[25] After Plaintiff was transferred from Fishkill, he underwent surgery on his left arm, receiving a procedure referred to in his medical records as a left "ulnar nerve release" to treat "a mild to moderate (L) carpal tunnel syndrome and a slight cubital tunnel syndrome (L) arm."  (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. B at 1, 6.)

factors, 315 F.3d at 162, the Court finds that Plaintiff has alleged facts which plausibly could support a finding that Plaintiff's elbow condition was sufficiently serious.  *See Hemmings v. Gorczyk*, 134 F.3d 104, 106 (2d Cir. 1998) (allegation of ruptured achilles tendon sufficiently plausible under objective prong of deliberate indifference standard to survive motion to dismiss).[26]

### 2.  Subjective Culpability.

To satisfy the subjective prong of the deliberate indifference standard, a plaintiff must allege facts showing that the defendant's actions constituted "more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir. 1996).  Additionally, "claims based on differences of opinions over matters of medical judgment[] fail to rise to the level of a § 1983 violation." *Sloan v. Zelker,* 362 F. Supp. 83, 84 (S.D.N.Y. 1973). "More specifically, a prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety.'" *Hathaway,* 99 F.3d at 553 (quoting *Farmer,* 511 U.S. at 837).  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of

---

[26] Regarding the mis-perscription of Motrin, Plaintiff has failed to allege facts which demonstrate that his pain was "sufficiently serious" under the objective prong.  He has not alleged that his pain was so "extreme" as to constitute a "condition of urgency."  *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The most he has alleged is that he was "in a lot of pain," (Compl. ¶ 34), but even construing his *pro se* complaint liberally, this allegation does not sufficiently indicate a condition of urgency "sufficiently grave" to deny him the "minimal civilized measure of life's necessities."  *Wilson,* 501 U.S. at 298.

Nor does Plaintiff allege that the risk of harm Dr. Supple subjected him to by mis-prescribing a pain reliever to which he was allergic was sufficiently serious.  When the alleged violation is an insufficient course of medical treatment provided, courts examine "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition . . . ."  *Salahuddin,* 467 F.3d at 280 (internal citations omitted).  Plaintiff has not specified the severity of his allergy, nor has he alleged that he did take or would have taken the Motrin, and so has not alleged facts which show that he was subjected to an unreasonable risk of harm.

Plaintiff has also failed to allege facts regarding his back or ankle condition at the time of the visit to Dr. Supple that would suffice under the objective prong of the deliberate indifference standard.  (*See* Compl. ¶ 29.)

serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.  A plaintiff  "need not show that a prison official acted or failed to act believing that harm would actually befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842-43.  The required state of mind is thus "equivalent to the familiar standard of 'recklessness' as used in criminal law." *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir. 2003).

Plaintiff has alleged that he told Dr. Supple he "could not straighten [his] left arm without receiving a lot of pain" as a result of the alleged beating.  (Compl. ¶ 29.)  Dr. Supple was thus aware of "facts from which the inference could be drawn that a substantial risk of serious harm exists."  *Farmer,* 511 U.S. at 837.  Though Dr. Supple refused to examine Plaintiff's elbow, saying "there was nothing wrong with [Plaintiff's arm or elbow] without touching it or x-rays," Dr. Supple did agree to take x-rays of Plaintiff's ankle.  (Compl. ¶ 29.)  Dr. Supple was thus aware that Plaintiff's general medical condition as a result of the alleged beating was severe enough to warrant x-rays or further examination, as is shown by his order of the ankle x-ray.  These allegations, coupled with Dr. Supple's brusque dismissal of Plaintiff's elbow complaints, indicate that Dr. Supple drew the inference that a "substantial risk of serious harm exists" *Farmer,* 511 U.S. at 837, and that he acted with "more than negligence."  *Hathaway*, 99 F.3d at 553.  It is true, as Defendants state, that courts will normally not base deliberate indifference liability on a disagreement over medical judgment, such as whether or not "an MRI should have been done."  *Joyner v. Greiner*, 195 F. Supp. 2d 500, 505 (S.D.N.Y. 2002).  But Plaintiff has alleged more than a disagreement over the appropriate course of medical treatment; his allegations, considered alongside each

other, show that Dr. Supple was both aware that Plaintiff had a serious medical condition and willfully disregarded whatever consequences might follow from failing to fully examine Plaintiff.  *Farmer*, 511 U.S. at 837.

Thus, Plaintiff has sufficiently alleged facts supporting a claim for deliberate indifference to serious medical needs under the Eighth Amendment against Dr. Supple for the failure to examine his elbow.  All other deliberate indifference claims against Dr. Supple are dismissed.

### ii.  Retaliation

To state a prima facie claim for retaliation under the First Amendment, a plaintiff must allege facts showing "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."[27] *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002); Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir. 2004).  As a general interpretive matter, "the Second Circuit has admonished district courts to approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Bumpus v. Canfield,* 495 F. Supp. 2d 316, 325 (W.D.N.Y. 2007) (*quoting Dawes*, 239 F.3d at 491).

---

[27] Even if Plaintiff makes this prima facie showing, Dr. Supple can still avoid liability by showing that he would have acted in the same way in the absence of the protected conduct.  *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003).

As concerns the first prong, whether the "speech or conduct at issue was protected" by the First Amendment, "[i]t is well established that the filing of [a] prison grievance[ ] . . . [is a] constitutionally protected activit[y]." *McClenton v. Menifee,* 05 Civ. 2844 (JGK), 2006 WL 2474872, at *12 (S.D.N.Y. Aug. 22, 2006) (*citing Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996)); *Salahuddin v. Mead,* No. 95 Civ. 8581 (MBM), 2002 WL 1968329 at *3 (S.D.N.Y. Aug. 26, 2002).  Plaintiff alleges that Dr. Supple retaliated against him for a previous grievance he filed against Dr. Supple. (Compl. at 10).  Thus, Plaintiff has satisfied the first prong of the retaliation analysis.

As for the second prong, the Second Circuit has held that in the prison context, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation."  *Dawes*, 239 F.3d at 493; *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir. 2003).  Taking Plaintiff's allegations as true, it is plausible that a denial of medical evaluation, treatment, and adequate pain medication would suffice to deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance against a prison doctor.  *See Williams v. Fisher*, No. 02 Civ. 4558 (LMM), 2003 WL 22170610, at *10-11 (S.D.N.Y. Sept. 18, 2003) ("Allegations that [a prison doctor] revoked Plaintiff's necessary medical rehabilitative treatment because he filed a grievance are sufficient to satisfy the second element of a retaliation claim [for the purposes of a motion to dismiss.]").

The third prong requires a "causal connection" connection between the protected conduct and the adverse action.  *Garcia v. Watts*, No. 08 Civ. 7778 (JSR), 2009 WL 2777085, at *11 (S.D.N.Y. Sept. 1, 2009).  A plaintiff must allege facts suggesting that

the protected conduct was a "'substantial or motivating factor' in the prison official's decision to take action against [him]." *Smith v. Christopher,* No. 9:06 Civ. 1196 (LEK) (DEP), 2008 WL 4283519, at *13 (N.D.N.Y. Sept. 18, 2008) (*quoting Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).  Circumstantial facts indicating a retaliatory motive include "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation."  *Baskerville v. Blot,* 224 F. Supp. 2d 723, 732-33 (S.D.N.Y 2002) (*citing Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir. 1995)).

"A plaintiff can establish a causal connection that suggests retaliation by showing that [the] protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009).  There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir. 2001), so courts judge "the permissible inferences that can be drawn from temporal proximity in the context of particular cases."  *Espinal*, 558 F.3d at 129.  However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, *Id.*; *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45-46 (2d Cir. 1980), while in other circumstances three months was considered too long.  *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990).

Plaintiff has not specified exactly when he filed the first grievance against Dr. Supple, stating only that the grievance number was "FCF 27276-05."  (Compl. ¶ 34.) The "-05" at the end of the grievance number presumably refers to the year 2005, based

on the fact that Plaintiff's other grievances were filed in 2006 and their grievance numbers both end in "-06." (Compl. ¶¶ 31, 34.) Plaintiff's appointment with Dr. Supple was on February 14, 2006. Depending on when in 2005 the first grievance was filed, the gap between the first grievance and the appointment was somewhere between just over thirteen months and just under two months. This period, standing alone, *may* be insufficient to establish a causal connection, but other factors militate in favor of finding a sufficiently alleged causal connection. *See Cronin v. St. Lawrence*, No. 08 Civ. 6346 (KMK), 2009 WL 2391861, at *5 (S.D.N.Y. Aug. 5, 2009) (collecting cases and finding that eleven-month gap did not preclude finding causal connection on motion to dismiss).

Plaintiff has not provided any allegations regarding his disciplinary record, but he has alleged other facts which corroborate his claim of retaliation. While all levels of the inmate grievance process determined that there was "no evidence of malice" on Dr. Supple's part, they all found that Dr. Supple had, by his own admission, prescribed Plaintiff a medication to which he was allergic. (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A 12, 14.) The Superintendent's ruling noted that Dr. Supple claimed he "did not notice the front cover sticker [on Plaintiff's medical records] noting that [he] was allergic to Motrin." (Pl's. Mem. Opp'n Def's. Mot. Dismiss Ex. A 12.) Plaintiff was thus was partially "vindicated" at a hearing on the matter. Furthermore, Dr. Supple failed to detect a condition which was later determined to require surgery. (Compl. at 9.) Plaintiff also alleges that in refusing to examine his elbow, Dr. Supple stated merely that it "look[ed] fine," and then told Plaintiff that his allergy to Motrin was Plaintiff's "problem." (Compl. ¶ 29.) While these comments do not explicitly state an intent to retaliate, they are consistent with and imply a retaliatory motive. *Baskerville*, 224 F.

Supp. 2d at 732-33 (defendant's alleged comments can be "circumstantial evidence of retaliatory intent").  The facts corroborating the existence of Plaintiff's injuries and the failings of Dr. Supple's diagnosis and treatment, when taken in conjunction with Plaintiff's allegations of the brusque treatment he received from Dr. Supple, sufficiently allege a "causal connection" between the filing of the grievance and the adverse action. *Dawes*, 239 F.3d at 492.

Accordingly, Plaintiff has met his burden in pleading a *prima facie* case of retaliation under the First Amendment.  So long as a plaintiff has elaborated his claim with sufficient non-conclusory factual allegations to raise a "persuasive" or even "colorable" claim of retaliation, the claim should survive the motion to dismiss stage. *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).  Given the totality of Plaintiff's allegations and the factual corroboration provided, Plaintiff has met this burden.

### iii.  Qualified Immunity

Dr. Supple claims he is entitled to qualified immunity with respect to all claims against him.[28]  "The doctrine of qualified immunity shields government employees acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their conduct violated clearly established rights of which an objectively reasonable official would have known." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568-69 (2d Cir. 1996).  Even if the right allegedly violated was well-defined, a defendant may still claim qualified immunity "if it was objectively reasonable for the public official to believe that his acts" were lawful.  *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir. 1991).

---

[28] As claims against the other moving Defendants have been dismissed on other grounds, only Dr. Supple's qualified immunity claims will be considered.

"Although qualified immunity is typically addressed at the summary judgment stage of the case," a defendant will be found to be shielded by qualified immunity on a motion to dismiss if "the complaint fails to allege the violation of a clearly established constitutional right." *Williams v. Fisher,* No. 02 Civ. 4558 (LMM), 2003 WL 22170610, at *11 (S.D.N.Y. Sept. 18, 2003) (citation omitted).  A claim of deliberate indifference to serious medical needs in violation of the Eighth Amendment alleges the violation of a clearly established right.  *Lloyd v. Lee*, 570 F. Supp. 2d 556, 570 (S.D.N.Y. 2008).  Additionally, a claim of government retaliation for the exercise of First Amendment rights also alleges the violation of a clearly established right.  *See Spang v. Katonah-Lewisboro Union Free School Dist.*, 626 F. Supp. 2d 389 (S.D.N.Y. 2009)*.*  Accordingly, Plaintiff's claims against Dr. Supple will not be dismissed pursuant to the doctrine of qualified immunity at this stage in the proceedings.

### III.    Conclusion

For the reasons stated herein, Defendants' motion to dismiss is granted as to Defendants Connolly and Cordell, and denied as to (a) the deliberate indifference claim against Defendant Dr. Supple relating to the failure to examine Plaintiff's elbow and (b)

the retaliation claim against Dr. Supple.  The Plaintiff's other claims against Dr. Supple are dismissed.

The parties are to submit a joint schedule to the Court on or before November 12, 2009, setting forth the dates for further proceedings in this case.

**SO ORDERED.**

Dated:   October 13, 2009
         New York, NY

_____
                  U.S.D.J.